The argued case this morning is number 08-5184, Andrew against Health and Human Services. Mr. Shoemaker. Thank you, Your Honor. Good morning, Your Honors. My name is Clifford Shoemaker. I represent the petitioner appellant in this case, Enrique Andrew. Enrique was born on September 5, 1995. If he had been born one year earlier, and the facts in this case had occurred one year earlier, he would have qualified as a table injury. In July of 1995, the table of injuries was changed to eliminate chronic seizure disorders as a table injury for DPT vaccine, and the definition of encephalopathy was changed so that most children do not fit the definition. The case before this court today, therefore, is a causation in fact claim being decided under the law as set forth in Althan and Capisano. It is petitioner appellant's claim that he has satisfied the requirements of proving causation by a simple preponderance, and no one has even suggested the possibility of any alternate cause in this case. The parties here agree, as Judge Merrill noted. Mr. Shoemaker, is that the correct severe argument that no alternate cause has been I think that fact, Your Honor, supports a logical sequence of cause and effect. I think the issue in this case is whether or not we have proven a logical sequence of cause and effect, the second prong of Althan. And our issue here before the court today, Your Honor, is I think that what the court and what the special master have done here is that they have taken this second prong of Althan, and they have, in effect, tried to re-inject prong two from the old Stevens analysis by requiring credibility, the credibility argument that they've made in this case, which requires medical literature, which requires consensus from the community, medical community consensus. It's bringing back the old things that were required under prong two of the Stevens argument. So our primary argument here today is whether or not we've demonstrated a logical sequence of cause and effect. As this court pointed out in Capisano, the second prong of Althan 3 test is not without meaning. While evidence used to support prongs one and three can be used to support prong two, this court stated, a claimant could satisfy the first and third prongs without satisfying the second prong when medical records and medical opinions do not suggest that the vaccine caused the injury or where the probability of coincidence or another cause prevents the caused the injury by preponderant evidence. But Mr. Schumacher, didn't we also say in Capisano that the second prong could be proven by a spillover from the first and the third? Yes, Your Honor. And I think we did that in this case. How was that done? That's what I'm trying to figure out. There's no question, Your Honor. Everybody agrees. And Judge Merrill pointed out that we did provide a medical theory of causation. Dr. Tornatore, who was probably one of those highly qualified witnesses to testify in this case, and who was the only expert who was qualified as not only a neurologist board certified, but also as an expert in the pathogenesis of brain injury. He was not a pediatric neurologist. That's the reason why. No, I understand that. But he directs the residency program at Georgetown. He is responsible for training residents in both pediatric and adult neurology. For the purpose of this case, his expertise was even more important because he was qualified as an expert in the pathogenesis of brain injury. When he worked at NIH, they worked with the exact materials that we're talking about here, showing how it affects the brain. So more than anyone else, he was familiar with the pathogenesis of brain injury. Highly qualified expert. Even Dr. Herskowitz said he brings a lot to the table in this case. And also Dr. DeRay testified as a treating physician that the vaccine, in his opinion, caused this injury. So prong one, we did put forward a logical medical theory. It doesn't even have to be logical. We put forward a medical theory. And that medical theory was described in detail by Dr. Tornatore. It did not require fever. It did not require... He knew that this was a febrile... It was not a... There was no demonstrated fever. We don't know what the temperature was because it wasn't measured. And as Dr. Herskowitz points out, as Dr. Dreznik points out, as many of the people point out, in most times, a temperature isn't measured when the first seizure occurs. Is that the only difference between the afebrile and the febrile issue? Yes, Your Honor. Is it temperature determination? That's correct. As to whether or not there was a temperature? It seems rather odd, though. If you're in a hospital, they wouldn't take the temperature at appropriate times during that stay? Your Honor, that's why the testimony of the treating doctors was not that significant. Because the first seizure did not occur in the hospital. Special Master Abel, who held the onset hearing and ruled on the facts of the case, ruled that the first seizure occurred within 24 hours of the vaccination on November 1st. It was witnessed by the grandfather. The grandfather did not take the temperature. So there was no doctor involved, no hospital involved. So there was no opportunity to take a fever. The grandfather did not take the temperature. Dr. Herskowitz, the respondent's expert, testified that a one degree elevation in temperature, in his opinion, would be adequate to show a febrile seizure. We don't know what Enrique's temperature was. Dr. Resnick, and we've pointed this out here, testified that it's not fair to require a fever. Because in most cases, temperature is not measured when the first seizure occurs. Subsequently, when they went to the hospital 10 days later, or 11 days later, there was no fever at that time. But that's not unusual for a chronic seizure disorder. As a matter of fact, under the old table injury, you had to show subsequent seizures after the one that occurred within three days of the vaccination that were not febrile. So it was important to show that there were more seizures going on that were not febrile. So the fact that 10 days later there was no fever, that has nothing to do with what caused the first seizure. And as a matter of fact, everyone agrees. On A392, the court asked Dr. Herskowitz, so whatever caused the initial seizure was causal for the subsequent seizures? Dr. Herskowitz answered, exactly. There's no question. Everybody agrees that whatever caused the first seizure caused the chronic seizure disorder that developed thereafter. There's no question that his seizures morphed over time. They got more and more serious. He had breakthrough seizures that couldn't be controlled by medication. They became intractable. And eventually he developed developmental delay because of the serious seizures that he experienced. What would be the cause? I couldn't quite figure it out. For the toxins to be focused at the beginning and then expand to other parts of the brain subsequently, is there anything in the record to show that that would be caused by the DPT? That's one of these things, Your Honor, that we can probably never know. Why do some people who get polio have paralysis in the legs? Some people don't. Why do some people have severe forms and recover? Why do millions of children not react to a vaccine whereas a few do? Obviously it's controlled somewhat by genetics, and Dr. Tornatore talked about susceptibility in genetics. It's controlled by the status of the child's immune system on the date of the vaccination, whatever other things are going on. But we will never understand or know why he had right-sided versus left-sided or left-sided versus right-sided, or why they weren't generalized, or why they spread and changed. That's not unusual. Seizure disorders do change and morph over time. And Dr. Herskowitz, everyone agreed that seizure disorders can morph or change over time, but they can then become intractable. Can those be related back then to the original seizure? Absolutely, and that's exactly what Dr. Herskowitz testified at A392, when he said exactly, whatever caused the initial seizure was causal for the subsequent seizures. Exactly, he said. No question about it. The issues here, Your Honor, I think what happened was, Judge Merrill was... Before you go on to that, I have a question about the... The master said that they ruled because there was a lack of credibility. Yes, sir. And that's, I guess, directed mostly at the treating physicians, right? It was also directed at Dr. Tornatore, too. Yes, sir. Is that really a lack of credibility? Isn't that sort of an attempt to use that rubric to avoid review? I mean, I don't see where that's a credibility determination at all. It is not a credibility determination, Your Honor. And in fact, what it is, is if the court, if the special masters are allowed to use credibility, basically a non-reviewable thing, to challenge these cases and to re-inject the requirements of medical literature and consensus in the scientific community and all these things that were rejected in Alton Capisano, in effect, it's going to just retreat from those cases and say, well, okay, you don't call it that. You don't call it the second prong of Stevens. What we'll call it is a credibility argument, which is basically unreviewable. They were really, I think that what she's saying is a matter of reliability of the evidence rather than credibility, do you think? Right. You're absolutely correct. And what she was talking, I think credibility is a bad word. I think when you look at the Bradley case, you're talking about fact witnesses. And this is really not credibility. This is not, these are highly qualified doctors. They're not lying or anything like that. This is an issue, expert issue. So it's really better phrased as persuasiveness. How persuasive was their testimony? And the persuasiveness argument, by using that argument as called credibility, that's pulling back in the requirement for epidemiology. We pointed out in our brief, there's extensive literature that we filed showing that you can have afebrile seizures, for instance, but that was not what the court was requiring. The court was requiring epidemiology, scientific certainty, the same kind of level of proof that we have for febrile seizures. I mean, everybody agrees that if the grandfather had taken the temperature and demonstrated a fever, then that would have been proven with epidemiological evidence. But as Dr. Resnick pointed out, and as Dr. Herskowitz admitted, Dr. Herskowitz admitted that many times a fever is not taken. Temperature is not taken. Dr. Resnick said it's not fair to require fever because many times it's not taken. Dr. Tornatore, in his testimony, when the court specifically asked him, do you require a fever for your theory? He said, no, it doesn't matter whether it's febrile or non-febrile. His theory of causation, the excitotoxicity, the neurotoxic effect of pertussis toxin, does not require a fever. Sure, there's great epidemiological evidence for febrile seizures, and sure, it's not as strong of evidence for afebrile seizures, but when has that been required? Halthon and Capozano took that away, said we did not have to have that kind of strong scientific certainty. This is mere preponderance. This is more likely than not. Dr. Tornatore provided a valid theory of causation. He provided the logical sequence of cause and effect in more detail than we'll probably get from anyone because of his expertise in the pathogenesis of brain injury. And the timing is striking. The temporal relationship is striking. The child gets a vaccine. Within 24 hours, the child is crying, is irritable, and has the first seizure within 24 hours. That's a striking temporal relationship. No one has suggested any alternate cause, and there is no alternate cause in this case. We've demonstrated this case, I believe, to a reasonable degree of certainty. In this case, we provided the evidence that satisfies Halthon and Capozano, and I agree. I think if you try to insert back in, under credibility, arguments that bring the old Stevens arguments back, that's wrong. The second part of this that I would like to talk about is the requirement of subpoenaing and going to Florida to take the testimony of treating doctors. If this tool is allowed to... If Capozano means that that's what's going to happen in future cases, where special masters, if a doctor in the record says, I don't believe there was causation, fine, they'll accept that and use it against the petitioners. But if an expert or a doctor, a treating doctor in the record says, I think this may have been caused by the vaccine, if that means now we're going to subpoena those doctors and we're going to fly off around the country to take their sworn testimony, this is going to destroy the patient privilege with those doctors. It's going to require them to do things that we've never required in this program. That is not what Capozano stands for. Capozano stood for the fact that if they wrote something in the medical records, you can reasonably interpret it and use it. And these doctors wrote things in the medical records that Dr. Tornatore reasonably construed as meaning that they thought the vaccine may have played a role. Dr. DeRay clearly agreed with that. When we took his testimony, he unquestionably said he thought of the vaccine, but he was criticized because he didn't have a medical theory supported by medical literature. He was criticized for the reasons that often says you don't have to have those things. Here's a doctor who 10 years ago saw this patient, wrote something in records. Now he's being subpoenaed. He's being set records by the special master from treatment of another doctor before he even saw this patient and being required to come into court and to testify about this. This was never the intention of Capozano. This is going to make this more litigious, more adversarial, more time consuming. If that weapon is used in the future, we're going to have a lot of problems in these cases. Where did that idea come from? When Judge Merrill sent the case back, I wish he would have just ruled for us because I think in his first order, he was correct in most respects. But he sent it back and said he gave the special master the permission to talk with these doctors and try to find out further evidence. The special master immediately subpoenaed them over our request. We moved our objection rather. We moved for reconsideration of that. Judge Merrill said no, it's going to happen. So we went to Florida. They were subpoenaed. Dr. DeRay, for instance, was sent records from a previous treating doctor that he was forced to review and comment upon. And the special master criticized him for not being totally familiar with those records, like he was supposed to study for an exam. I mean, this kind of thing cannot happen in these cases. It can destroy a doctor-patient relationship for a young child who's still being treated by these doctors. We have to be able to rely upon what the medical records say, contemporaneous medical records. And that's what Capozano stands for. But the requirement is not prohibited by the rules of evidence. No, Your Honor, it's not. It's absolutely not. So it really is a question of relevancy at that point, isn't it? That's correct. And what the special master clearly did was try to get them to dispute something that Dr. Tornatore had said. It was almost like the special master was interrogating these treating doctors, trying to cast more dispersions on the credibility of Dr. Tornatore. That was what this whole thing was all about. Dr. Resnick and Dr. DeRay were asked questions about the MRI and the spec scans, how they had been interpreted. They were not asked the same questions that Dr. Tornatore was asked. They were asked different questions. And the answers they gave, then, the special master used to say, this contradicts what Dr. Tornatore said. It didn't contradict it the least. We've detailed that in our brief. Dr. Tornatore said exactly the same things about the MRI and the spec scans. Was that a request made by the government, or was that a sua sponte action on the part of the special master? It was sua sponte on the part of the special master, Your Honor. Let's hear from the government. We'll save you a little time. Thank you, Your Honor. Good morning, Your Honor. May it please the court. Mr. Wishart. Well, obviously, we respectfully request that your court affirm the decision of the special master and the court of federal claims in this case, because we believe that under pronged too often, petitioners have failed to prove a logical sequence of cause and effect between the vaccine and the injury. We believe the important portion of pronged too often deals with the facts, and the facts in this case support the finding by the special master and by the court of federal claims. The clinical symptoms that Enrique suffered at the time of his initial presentation at Miami Children's Hospital do not support the theory alleged. What, in your view, is missing? You're not disputing that the first symptoms were manifested the day after the vaccination. So what else is needed? That's correct, ma'am. The special master did find that, Your Honor, special master Abel. We're disputing the condition. He was acting normally. He was behaving normally. He had no bulging fontanelle, which would indicate some type of evidence of a toxic brain injury, as alleged by Dr. Tornick. Recall that Dr. Tornitore's theory was there some type of toxin that impacted Enrique's brain, causing his seizures and eventual developmental delay. And in this case, there was no evidence of that clinically at all, based upon his presentation. He was eating. He was sleeping. He was acting normally. He had no fever. Not only at the time that he was admitted, but the parents never- We don't know whether or not he had a fever. It just was not taken at that particular time. It was not taken at the particular time that the first seizures were indicated. And there was never any report, Your Honor, of any fever by the parents at all after the vaccines occurred. And there was no fever upon admission at Miami Children's Hospital. But if, in fact, the fever differential can be one degree, I don't know if parents can test that without really taking a thermometer and testing it. You can't just do it by putting your hand on a forehead or on the side or otherwise, as you normally would for a child. And a child's temperature, in most cases, is different than an adult's temperature. It can be higher, considerably higher, for children than it is for adults. Certainly. And as a parent, I know if I touch my kid's forehead, I know he has a fever much quicker than I can tell if I have a fever. And there was no report at all by either the grandparent, grandfather, or the parents that there was ever any indication that Enrique felt hot or had any evidence of any seizure. And that was not reported to the doctors at Miami Children's Hospital. And that was something that Dr. Resnick, who was Enrique's initial treating physician, felt important in terms of weighing, in his mind, what possible causes could have occurred in this case for Enrique's seizures. And that weighed in his mind, as well as the fact that Enrique presented normally, clinically. Do you agree that the temperature or the presence of a fever is the only difference in afebrile and febrile reactions? That's the definition, febrile being seizures with fever, afebrile being seizures without fever. That's the medical definition? That's correct, Your Honor. It's not in the record, anyway. I'm sorry, Your Honor? It's not in the record, anyway, as to whether or not that is the only difference. Yeah. My understanding from the medical definition is one is with fever, one is without fever. And a lot of times when we're actually at hearings, we have to enunciate that because of the fact that afebrile and febrile a lot of times sound the same on the record. But anyway, in addition to the clinical evidence, Your Honor, there's no diagnostic evidence here that Enrique suffered any type of toxic brain injury. There were three separate diagnostic studies that were performed on Enrique at Miami Children's Hospital when he initially presented. The first one was an MRI exam. And that MRI exam did not show any evidence of any brain injury or atrophy or insult. And that's important in light of Dr. Tornatore's toxic brain theory. Dr. Herskowitz testified that if one, on behalf of the respondent, that if one were to believe Dr. Tornatore's theory that somehow or another a toxin crossed the blood-brain barrier into the brain, you would see evidence on that initial MRI, or even the subsequent MRIs, which showed no evidence of any toxic brain injury. You would see some type of evidence of abnormal myelin. You would see evidence of damage to the gray matter. And Enrique's MRIs never had any information at all which could pinpoint any type of damage. But the symptoms were there. Is the government's position that the government had no burden to demonstrate a possible alternative cause for what has happened to this infant? Oh, yes, Your Honor. I believe that's correct. I believe that the burden doesn't shift to the government for alternate cause until the petitioners meet all three elements of all that. And they didn't meet prong two in this case based upon the facts. There are several other diagnostic studies that were performed on Enrique at the initial hospitalization. One was a SPECT scan. And this shows blood flow to the brain. And this did show, it doesn't show structure. It shows blood flow. And in this case, it showed blood flow consistent with Enrique's left-sided seizures. He had normally a high amount of blood flow to the right side, which was consistent with the left-sided seizures. I don't want to interrupt your train of thought. But I'd like to pursue the question that I raised. Is the government's position that the petitioner must show a more likely than not preponderance before the burden shifts or a prima facie case or what? They must show. Before the burden shifts. Your Honor, the burden shifts once the petitioners have met all three prongs of all that by preponderant evidence. And in this case, the focus is on prong two, a logical sequence of cause and effect. And it's the government's position that based upon the facts in this case, the clinical evidence, as well as the diagnostic studies, it does not support the theory alleged. It's basically illogical to conclude that this is how Enrique's injury occurred. So you're saying it's not enough to show a prima facie case. It has to be the preponderant before, as the statute shows, the burden shifts to the government. As the statute says, it's our contention that they need preponderant evidence on all three prongs of all in order for the burden to shift. Preponderant, but there was no contradictory evidence. So whether you say preponderant, preponderant is against what? It's our contention that they need to meet the necessary proof under prong two in this case. And we don't think that they've done that in this case, based upon the facts as they have presented the facts. What did they need? What more did they need? Well, they need a theory that comports with the facts, Your Honor. In this case, the theory doesn't comport with the facts. If Enrique had some type of toxic injury, one would expect to see global seizures. One would expect to see multifocal seizures. One would expect to see damage to his brain. One would expect to see a drop off in milestones meeting or head circumference. And none of those things happened for several years after this incident. It was only many years thereafter, two years thereafter, that things started to drop off for this child. And it doesn't comport with the theory that Dr. Tonatori alleges. That somehow or another, some toxin crossed the blood-brain barrier and came in and caused this initial seizure. Couldn't that localized toxin induction, let's call it for lack of a better term, when it did cross the barrier and then subsequently expand, might not have been measurable until the expansion took place? If it was in fact localized initially? Several points on that, Your Honor. I'm not sure if there's any testimony at all that focused in on the fact that this somehow or another could have localized in one particular area. Dr. Tonatori actually testified and he tried to use the SPECT scan as a basis to say that there was something going on on the other side of the brain. However, Dr. Herskowitz and both treating physicians disputed that and said, no, the SPECT scan really doesn't tell us anything other than where the seizures are coming from. And in this case, Dr. Herskowitz's testimony was strong in terms of the fact, again, as I stated earlier, if there's a toxin there, a toxin is going to affect the brain itself. It's not going to focus on one particular area. And as Dr. Herskowitz testified in this case as the EEG, which is the third diagnostic study that was taken on Enrique showed, the seizures that he had were exquisitely focal. I mean, they were very narrow in nature. They were brief. And that doesn't, again, comport, the facts don't comport with the evidence at hand here. But Dr. Tonatori did testify that it was a localized toxin at the beginning. He did testify as to his theory that how the toxin was close to blood-brain barrier and would be localized particularly. But then he also testified later that the SPECT scan supported his theory as well, although he later admitted that the findings of the SPECT scan himself and the radiologist didn't necessarily equate to a vaccine interest. Is that material all in the appendix? That is. Specifically, if you look, I think at page 250 to 251, Dr. Tonatori talks about the findings on the SPECT scan specifically. I do remember that one off the top of my head. The third point in this case that I want to focus on is regarding the evidence submitted. It's our contention that there's no reputable or reliable evidence in this case to show that these seizures were caused by the DPT vaccine, either through some type of toxic brain injury or through some type of other theory. Dr. Tonatori's theory just doesn't comport with the facts. There was some discussion, I know, in Petitioner's argument about what the special master did in terms of reviewing the evidence in this case. And it's our contention that what she did was the proper thing. She reviewed the evidence based upon Daubert, as Tarrant applies Daubert to the Vaccine Act cases for reliability, for credibility as part of one of the factors. And determining whether or not- Daubert talks about reliability of the evidence, not credibility. That's right, Your Honor. And she weighed the qualifications of the various experts, Dr. Tonatori, who was an adult. Do you agree this is not a matter of credibility? Do I agree that- well, it depends. I think that as a special master, in reviewing the facts, has to determine credibility of witnesses. I know that Bradley was raised for the proposition that- Indeed. But in talking about the evidence that the special master said was not credible, it certainly looked to me as if what the special master was saying is that there is not scientific support. I think that, yeah, perhaps- Not that you're not telling the truth. Exactly. I think perhaps the word credible is an artful there. Probably credibility means based upon the reliability of the information provided, the evidence submitted, the studies, the whole array. The clinical facts, the diagnostic studies. I think it was more of a reliability weighing. And I think it's pretty clear from her decision that she's looking at this under the Daubert factors. Not necessarily for admission- And so you are agreeing that she's trying to re-inject the Stevens factor? Because that's what you just said. She was saying there wasn't the literature to support. Well, that's the point. Absolutely not. There's no mention of Stevens at all. And there's no- Of course there's not. And there's no way to talk- Indirectly what she can't do directly, right? Well, no, Your Honor. I disagree respectfully. I think that in this case, she's basically looking at the information she has in front of her. In this case, the petitioner has filed medical literature to support the theory. As the special master, she has the obligation to review that information for its reliability and make a determination whether it's reliable, as well as whether it comports with the testimony given by the petitioner's experts. There was no requirement here that medical literature be provided. That was never even mentioned at all. That was one factor. The clinical evidence was one factor. The diagnostic studies was another factor. The information provided by Dr. Resnick and Dr. DeRay at the time they treated was another factor. All these factors combined as the special master, as the fact finder in this case, with her specialized knowledge in this area, made the determination based upon all that information. There was no specific requirement. As often says, you can't require medical literature. And she didn't require medical literature in this case. And I think that the fact that the argument's being made here, Stephen's, there is no Stephen's argument here. How about this other argument that he raised about the inquisitorial nature of this inquiry down in Florida? Well, it was inquisitical because we wanted to focus on the issue at hand in terms of what- Special master who was initiating this, he said. Well, I was there too. And I think that I initiated some of that as well. I mean, the purpose of the hearing was- The purpose of the argument is to find out if it's true. He said she did. Well, the purpose of the hearing- What did you do? I questioned both Dr.- What did you do to initiate it? I, you mean at the hearing, your honor? To initiate this process. Oh. And calling these doctors in. Doctors in. Well, we had a status conference immediately after Judge Murrow issued his remand order. It was requested for petitioner's counsel whether or not they wanted to call these witnesses and they chose not to do so. The special master then directed me to issue subpoenas to obtain a testimony from Dr. DeRay and Dr. Resnick, which we did. And we served them. And we also provided them with a copy of all the treatment records for Ririque from Miami Children's Hospital. But it was not your motion that caused that testimony to be taken. No. It was a spontaneous part of the special master. No, your honor. It was on behalf of the special master who was basically directed by Judge Murrow to go ahead and, to the extent we could, take this testimony from these treating physicians. And it was needed to fill in the gaps. I mean, there was information. It's not your typical situation, contrary to what petitioner's counsel says. I don't think this is your typical situation for a vaccine case. I don't think that you're seeing respondents' counsel going and subpoenaing treating physicians in light of Capizano. We have a unique situation here. We have an expert who has relied on a report from Dr. Resnick, which was not clear. The testimony was needed in order to fill in the gaps as to what he was thinking, what he saw, and what it meant to him at the time that he was treating Enrique in 1995. Also, it was unclear what Dr. DeRay, who in 2001 issued his two-sentence report about causation, what he reviewed, what he was thinking, what treatment he gave to support that opinion as well. So I think that this is going to be an exception, not a rule in terms of Capizano. But I think Capizano allows it because it says, Capizano specifically says that medical records and medical opinion evidence from the treaters, they're in the best position to provide information. In this case, the information relied on by the competing experts. They were obviously interpreting this differently. Going to the source was the proper thing to do for the special master in the court here in order to obtain the best evidence to make the best determination in this case. Do you agree that Capizano, that the second prong could be proven by spillover from the first and the third? In certain circumstances, yes, Your Honor. But I think that you have to have the facts to support it. There has to be some logic to get from point A to point B. And that's where I think the gap is here. The facts just don't comport for a logical sequence of cause and effect between the vaccine and the injury. With that, we request that your court affirm the decision of the Court of Federal Claims and special master. Thank you, Mr. Bishop. Mr. Shoemaker. Thank you, Your Honor. I'll try to be as brief as possible. First of all, there were no gaps filled in by the trip to Florida. The trip to Florida was simply an inquisitorial trip where the special master and the Department of Justice attorney were quizzing Dr. DeRay and Dr. Resnick trying to challenge what they had previously written in the medical records. If you read our briefs, it's very clear on that point. There were no gaps filled in. There was no additional evidence provided or offered. The argument about the fever, Your Honor, you're absolutely correct. The fever is not required. If you start looking on page 41 of our brief, we talk about the medical literature that we cited about afebrile seizures. We even cited an article that showed that the relative risk of afebrile seizures was 1.94, almost twice as much as the background. So we almost had the gold standard of 2 for epidemiological proof for afebrile seizures. We provided evidence that afebrile seizures can be caused by DPT vaccine. And as you correctly point out, as all the doctors in this case testified, Dr. Herskowitz, Dr. Resnick, everyone testified, most times the fever is not measured. It's that simple. So it's almost impossible to epidemiologically say whether or not there is an increased risk when you don't measure something. Clearly there's strong epidemiological proof for febrile seizures. We also provided proof for afebrile seizures. If you look at Dr. Tornatore's testimony on page A178, the court asked, and would those seizures be febrile, afebrile, or both? Answer, they could be either. So his medical theory of causation clearly accepted the fact that the seizures could be either. Dr. Tornatore went into a great deal of explanation as to how chronic seizure disorders develop and how these seizures morph over time and how eventually it might become intractable and you end up with general delays, developmental delays. He explained that in detail. He talked about the formation of scar tissue, how it lowers the seizure threshold. Every time you have a seizure, you're lowering the threshold for having more seizures. So he went into this in great detail as how this can progress over time. That was well explained by Dr. Tornatore. And yes, Dr. Resnick testified that it's more typical. You might more likely expect to see a full-blown encephalopathy. And for instance, Dr. Herskowitz testified about he would like to see the bulging fontanelle. He would like to see all these things up to unstate and everything else. Anything that can produce a massive encephalopathy can obviously produce something less on the scale, from seizures to something on down the scale. So to say that you have to have a full-blown encephalopathy is ridiculous. We know that some people get an illness. They may be very sick. Some people may get an illness and be very, just only a mild illness. Some people may be infected and have no symptoms. So there's a spectrum that occurs in these cases. Chronic seizure disorders by their very nature can start out as focal seizures and then morph over time. So that's not a question in this case, and it was well testified to by Dr. Tornatore. The MRI and SPECT scan, I just want to spend a minute on that. I know I don't have much time. But Dr. Resnick and Dr. DeRay said nothing different than Dr. Tornatore. What Dr. Tornatore said was when you look at the SPECT scan, you could see that on one side of the brain there was hyperperfusion. All it measures is blood flow. And he explained this in detail. He said all this shows you is blood flow. On one side of the brain there was increased blood flow. That would be explained on the basis of the actual left-sided seizures that were occurring. The right side of the brain controls the left-side seizures. So he said that's exactly what you would expect to see. Dr. DeRay, Dr. Resnick agreed with that. But then Dr. Tornatore looked over at the left side of the brain. And he said there's also evidence on the left side of the brain of hyperperfusion, that is decreased blood flow. Now the radiologist who read that said that could be caused by atrophy or developmental delay. Dr. Tornatore said no, those things didn't cause it. And why do we know that didn't cause it? Because there were MRIs done, and the MRIs didn't show atrophy or developmental delay. It's exactly the same thing that Dr. DeRay and Dr. Resnick testified in Florida. The exact same thing. But the special master, because she asked different questions of them, she asked them the question, is there anything on that SPECT scan that tells you the DPT vaccine caused the seizure? That's not what Dr. Tornatore said. He pointed out all the different things that could cause hyperperfusion. And he mentioned that it could have been the things the radiologist talked about, but it wasn't because the MRI showed that it wasn't. And then he said, one of the things that could cause that is this toxic insult that I'm talking about. That's all he said. That question was never asked of Dr. DeRay, never asked of Dr. Resnick. Now, we do need to wrap it up. I think, unless you have some more questions. If I could just conclude with one thing about your statement, Your Honor, that is that while the burden did not shift to the government to prove an alternate cause, in this case, we actually proved that there was no alternate cause. Dr. DeRay testified that one of the reasons he felt there was causation was the differential diagnosis. Over the years, he saw no other cause, so he eliminated other causes. So we did that in this case, whether the burden shifted or not. Thank you, Mr. Shoemaker, Mr. Wishart. The case is taken under submission. That concludes the morning arguments.